**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Christopher Derchin, individually and on behalf of all others similarly situated,<br><br>        Plaintifff,<br><br> -against-<br><br>Unilever United States, Inc.,<br><br>        Defendant. | Case No. 1:19-cv-03543-RPK-RER<br><br>**CONFIDENTIAL – TO BE FILED UNDER SEAL**<br><br>ORAL ARGUMENT REQUESTED |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

FOLEY HOAG LLP

August T. Horvath
(*ahorvath@foleyhoag.com*)
1301 Sixth Avenue, 25th Floor
New York, New York 10019
Tel:  (646) 927-5500
Fax:  (646) 927-5599

*Attorneys for Defendant Unilever*
*United States, Inc.*

B5027443.4

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

ARGUMENT ..........................................................................................................5

I.  PLAINTIFF MAY NOT ENFORCE FOOD REGULATIONS ..........................................5

    A.  Plaintiff's Attempt to Enforce the FDCA Is Preempted .......................................5

    B.  No New York Food Law Covers the Subject Matter of this Lawsuit......................7

    C.  Even if a New York Food Law Covered this Lawsuit, Plaintiff Lacks
        Standing to Enforce It ...............................................................................9

    D.  The Product Complies with All Regulations, and Plaintiff's Attempt to
        Impose Additional Requirements Is Preempted ....................................................10

II.  PLAINTIFF DOES NOT PLAUSIBLY ALLEGE CONSUMER DECEPTION............12

    A.  Implausible False-Advertising Suits Are Dismissed as a Matter of Law .............12

    B.  No Reasonable Consumer Believes that Identifying "Vanilla" as a Flavor of
        Ice Cream Has Any of the Implications Alleged by Plaintiff...............................14

    C.  Plaintiff Has No Basis for His Assumptions about the Product's Ingredients ......15

    D.  Breyers Natural Vanilla Ice Cream Is Exactly What Plaintiff Claims It Is
        Represented as Being ...............................................................................19

    E.  Unilever's Actual Formulation Completely Invalidates Plaintiff's
        Spectroscopy Test .....................................................................................21

III.  PLAINTIFF'S ANCILLARY CAUSES OF ACTION ARE IMPROPERLY PLED
     AND/OR INAPPROPRIATE ...........................................................................21

IV.  PLAINTIFF HAS NO STANDING TO SEEK INJUNCTIVE RELIEF .........................25

CONCLUSION......................................................................................................25

i

B5027443.4

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
 115 A.D.3d 128 (App. Div. 2014) ........................................................................ 23

*Bowring v. Sapporo U.S.A., Inc.*,
 234 F. Supp. 3d 386 (E.D.N.Y. 2017) .................................................................. 25

*Buonasera v. Honest Co., Inc.*,
 208 F. Supp. 3d 555 (S.D.N.Y. 2016) ................................................................. 25

*Bush v. Mondelez Int'l*,
 No. 16-cv-02460-RS, 2016 U.S. Dist. LEXIS 174391 (N.D. Cal. Dec. 16, 2016) ................ 14

*Campbell v. Freshbev LLC*,
 322 F. Supp. 3d 330 (E.D.N.Y. 2018) .................................................................. 13

*Campbell-Clark v. Blue Diamond Growers*,
 No. 1:18-cv-5577-WFK (E.D.N.Y. Dec. 17, 2019) ................................................. 13

*Casey v. Odwalla, Inc.*,
 338 F. Supp. 3d 284 (S.D.N.Y. 2018) ................................................................. 12

*Chill v. Gen. Elec. Co.*,
 101 F.3d 263 (2d Cir. 1996) ............................................................................. 24

*Cohen v. S.A.C. Trading Corp.*,
 711 F.3d 353 (2d Cir. 2013) ............................................................................. 24

*Davis v. Hain Celestial Grp., Inc.*,
 297 F. Supp. 3d 327 (E.D.N.Y. 2018) .................................................................. 25

*Elkind v. Revlon Consumer Prods. Corp.*,
 No. 14-2484, 2015 U.S. Dist. LEXIS 63464, (E.D.N.Y. May 14, 2015) ....................... 25

*Fink v. Time Warner Cable*,
 714 F.3d 739 (2d Cir. 2013) ............................................................................. 13

*Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*,
 148 F. Supp. 3d 285 (S.D.N.Y. 2015) ................................................................. 25

*In re Frito-Lay North America All Natural Litigation*,
 12-MD-2413, 2013 U.S. Dist. LEXIS 123824, (E.D.N.Y. Aug. 29, 2013) ............... 22, 24

B5027443.4

*In re Trader Joe's Tuna Litig.*,
   289 F. Supp. 3d 1074 (S.D. Cal. 2017) ................................................................ 7, 8

*International Prods. Co. v. Erie R. R. Co.*,
   244 N.Y. 331 (1927) ...................................................................................... 23

*J.A.O. Acquisition Corp. v. Stavitsky*,
   8 N.Y.3d 144 (2007) ...................................................................................... 23

*Kimmell v. Schaefer*,
   89 N.Y.2d 257 (1996). .................................................................................. 23

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) .......................................................................... 24

*Mandarin Trading Ltd. v. Wildenstein*,
   16 N.Y.3d 173 (2011) .................................................................................... 23

*McBeth v. Porges*,
   171 F. Supp. 3d 216 (S.D.N.Y. 2016) ........................................................... 24

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015) .................................................................... 12, 13

*Patane v. Nestle Waters North America, Inc.*,
   314 F. Supp. 3d 375 (D. Conn. 2018) ................................................... *passim*

*Patane v. Nestle Waters of North America, Inc.*,
   369 F. Supp. 3d 382 (D. Conn. 2019) .................................................... 8, 9, 10

*PDK Labs, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997) .......................................................................... 6

*Price v. L'Oreal USA, Inc.*,
   No. 17-civ-0614, 2017 U.S. Dist. LEXIS 165931 (S.D.N.Y. Oct. 5, 2017) ............ 25

*Reyes v. Crystal Farms Refrigerated Distrib. Co.*,
   No. 18-cv-2250, 2019 U.S. Dist. LEXIS 125971 (E.D.N.Y. July 26, 2019) ........... 13

*Sarr v. BEF Foods*,
   No. 18-cv-6409-ARR, 2020 U.S. Dist. LEXIS 25594 (E.D.N.Y. Feb. 13, 2020) ............. 13, 24

*Schwartzco Enterprises LLC v. TMH Mgmt., LLC*,
   60 F. Supp. 3d 331 (E.D.N.Y. 2014) .............................................................. 24

*Solak v. Hain Celestial Grp., Inc.*,
   No. 3:17-cv-0704-LEK-DEP, 2018 U.S. Dist. LEXIS 64270 (N.D.N.Y. April 17, 2018) ...... 13

*Thomas v. Costco Wholesale Corp.*,
   No. 5:12-CV-02908-EJD, slip op. (N.D. Cal. Mar. 31, 2014) ................................. 15

*Tomasino v. Estee Lauder Cos., Inc.*,
   44 F. Supp. 3d 251 (E.D.N.Y. 2014) ........................................................... 25

*Verzani v. Costco Wholesale Corp.*,
   No. 09-cv-2117, 2010 U.S. Dist. LEXIS 107699 (S.D.N.Y. Sept. 28, 2010),
   *aff'd*, 432 Fed. Appx. 29 (2d Cir. 2011) .............................................. 6, 8

*Weisblum v. Prophase Labs, Inc.*,
   88 F. Supp. 3d 283 (S.D.N.Y. 2015)........................................................... 24

## Statutes & Regulations

1 N.Y.C.R.R. § 32.1 ..................................................................................... 9

10 N.Y.C.R.R. § 5-6.3 ................................................................................. 8

21 C.F.R. § 101.22 ............................................................................. *passim*

21 C.F.R. § 135.110 ......................................................................... 5, 12, 17

21 C.F.R. § 169.175 ............................................................................ 11, 12

21 C.F.R. § 169.177 ............................................................................ 11, 12

21 U.S.C. § 337 ........................................................................................... 6

21 U.S.C. § 343 .............................................................................. 8, 11, 16

Cal. Bus. & Prof. Code § 17200 ............................................................... 10

Fed. R. Civ. P. 9(b) ................................................................................. 24

New York GBL §§ 349-350 .................................................................. 2, 8

Sherman Food, Drug, and Cosmetic Law, H.S.C. §§ 109875 ................... 7

U.C.C. § 2-314 ........................................................................................ 22

## <u>INTRODUCTION</u>

In the First Amended Complaint (Dkt. 10, "FAC"), part of a campaign of over 80 cut-and-paste lawsuits filed by these counsel against vanilla flavored products, Plaintiff alleges that the name of Breyers Natural Vanilla Ice Cream (the "Product") communicates to consumers an extensive series of implied messages about an exclusive source of the vanilla flavoring in the ice cream.  Common sense and common knowledge dictate the opposite.  Consumers understand that "vanilla" is a flavor designator, not an ingredient claim.  A reasonable consumer would not perceive the misleading messages alleged by Plaintiff to be communicated about the products, and the remedies suggested by Plaintiff would make no difference in a reasonable consumer's interpretation of the packaging.

 Despite extensive allegations, many of them historical, gratuitous, and unrelated to the facts and substantive allegations of the lawsuit, Plaintiff has failed to plead any plausible basis as to why a reasonable consumer would care what the source of the vanilla taste is, and even if he did, why he would expect all the vanilla flavor to come solely from vanilla beans.  Consumers do not desire vanilla bean extract for its nutritive properties, for it is not a nutrient – it is strictly a flavoring, as Plaintiff cannot dispute.  Even if some consumers prefer naturally derived flavorings and ingredients, Plaintiff cannot and does not dispute that this is true of the flavorings used in Breyers Natural Vanilla Ice Cream.

Even if Plaintiff could establish that the Product's labeling communicates what he claims it does, Plaintiff has failed to allege plausibly that the contents of the Product differ from what is allegedly represented.  Plaintiff has no basis for anything that he alleges about the contents of the Product other than the occurrence of one term – "natural flavor" – in its ingredient statement, to which Plaintiff attaches unwarranted interpretations and exaggerated significance, and a mass

spectroscopy analysis that is self-evidently worthless.  Now that limited court-ordered discovery has taken place in this case, all parties are aware that this particular Product is exactly what Plaintiff claims it is represented to be – an ice cream all of whose vanilla flavor comes from vanilla bean extract.

Plaintiff's substantive allegations are concerned almost entirely with accusations that Unilever violated the Food, Drug & Cosmetic Act (FDCA), as interpreted by Plaintiff.  Plaintiff's entire basis for asserting consumer deception is that a violation of the FDCA is, *per se*, a deceptive practice under state consumer protection laws such as New York's GBL §§ 349-350.  But Plaintiff incorrectly interprets the FDCA, mischaracterizes and misconstrues the regulations under the statute, and relies on unreliable third-party sources and his own non-expert intuition for their interpretations.  In fact, Unilever's practices comply with the FDCA.  Second, and moreover, the parties should not be litigating whether Unilever violated the FDCA before this Court in the guise of New York GBL §§ 349-350 claims.  Not only are alleged violations of the FDCA not *per se* deceptive practices under GBL §§ 349-350, but Plaintiff is expressly preempted from attempting to enforce the FDCA privately by positing state-law duties that are tantamount to FDCA compliance.  In any event, documents produced in the discovery ordered by the Court in this matter establish not merely that Plaintiff had no basis to allege any violation of the FDCA, but that Plaintiff's underlying factual assumptions about the Product – never backed up by anything but guesswork and wishful thinking – were flat-out wrong.  Breyers Natural Vanilla Ice Cream gets its vanilla flavor solely from vanilla bean extract, making it compliant even with the extreme and incorrect interpretation of FDA regulations posited by Plaintiff.

## FACTUAL BACKGROUND

Defendant Unilever United States, Inc. ("Unilever") makes and sells ice cream under the Breyers brand, which dates back to William A. Breyer's first sales of ice cream in Philadelphia in 1866.  Breyers ice cream has evolved over time to meet the changing needs of consumers. The flavoring of food products, including ice cream, has seen technical advances and increased sophistication over the decades.  Food products are increasingly flavored not just with a few simple ingredients, but with carefully formulated packages of extracts and other flavors.  These packages are formulated to deliver a more complex and interesting taste profile, to ensure flavor consistency (noted in FAC ¶ 45), and to enable differentiation in product lines.[1]  For example, Unilever markets a Breyers Homemade Vanilla and a Breyers French Vanilla ice cream in addition to the Product here, which differ, in part, in the secondary (non-vanilla) flavors and textures added through these components.[2]

In ice creams that incorporate one of these components – commonly termed a with-other-natural-flavors, or "WONF" package – the flavor supplier, without disclosing its exact ingredients, generally certifies that the flavoring meets any requirements set by the ice cream

---

[1] Much of this innovation has occurred after the 1970s, the period relied on by Plaintiff for his interpretations of food regulation, and has resulted in changes in regulatory practices and enforcement priorities.  Plaintiff never acknowledges the outdated nature of his food-regulatory arguments, although it is conspicuous that all of his supporting enforcement correspondence dates from 1979 or earlier.  See FAC Exs. A-E.

[2] In the original Complaint, Plaintiff challenged each of these products.  Dkt. 1 at ¶¶ 3, 15.  In the First Amended Complaint, perhaps to avoid acknowledging that more than mere vanilla is obviously included in these differentiated vanilla ice creams, Plaintiff has withdrawn allegations as to Homemade Vanilla and French Vanilla, leaving Breyers Natural Vanilla Ice Cream, FAC ¶ 3, as the only product now being challenged.

3

manufacturer, such as being all-natural, organic, and so forth, as well as providing guidance on the declaration of the flavoring in the ingredient statement.  The ice cream manufacturer creates labeling for the ice cream that meets the requirements of the Food, Drug & Cosmetic Act and also is truthful and transparent to consumers.

None of the above-described sophisticated process of developing a great tasting ice cream fits into Plaintiff's simplistic, cynical worldview.  Plaintiff alleges that the designation of a product as "vanilla ice cream," regardless of the nature or context of the representation, implies, to consumers, all of the following:

1.     vanilla is the characterizing flavor;
2.     vanilla is contained in a sufficient amount to flavor the product;
3.     the flavor is derived from vanilla extract or vanilla flavoring;
4.     no other flavors simulate, resemble, reinforce, extend or enhance flavoring from vanilla or permit less real vanilla to be used; and
5.     vanilla is the exclusive source of flavor.

FAC ¶ 79.  Except for #1, it is implausible that reasonable consumers perceive any, let alone all, of these meanings from the mere designation of a product as "vanilla ice cream."  Some of the implied meanings contradict each other:  vanilla flavoring, as Plaintiff admits, may come from sources other than vanilla beans (FAC ¶ 45), so the third alleged meaning is inconsistent with the fifth.  The second and fourth implied meanings are too vague ever to be proven or disproven – who, if not consumers through their purchasing decisions, is to be the judge of whether there is a "sufficient amount [of vanilla] to flavor the product"?  There is no accepted standard for such an amount.  If "simulate, resemble, reinforce, extend or enhance" in the fourth imputed meaning are not synonyms, what does each mean?  Moreover, Plaintiff alleges not the slightest factual basis to contend that consumers read "vanilla ice cream" to mean anything other than the first meaning – that the ice cream has a vanilla taste.

4

Plaintiff alleges that these implied statements are deceptive because, allegedly, there are other flavorings in the products besides vanilla extract; there are simulated vanilla flavorings in the products; and/or there is "de minimis" vanilla extract in the products, insufficient to impart vanilla flavor. FAC ¶ 82-84. The main basis for these allegations is that the ingredient lists on the side or back label of the Product includes the item "natural flavor" rather than specifying "vanilla extract." FAC ¶ 78. For the second allegation, Plaintiff cites and attaches a gas chromatography/mass spectrometry analysis, whose interpretation is entirely his attorneys', with no support from the researcher who conducted the analysis or any other expert. FAC ¶¶ 92-116. As detailed below, this analysis is facially invalid and provides no support for the allegations.

## ARGUMENT

### I.   PLAINTIFF MAY NOT ENFORCE FOOD REGULATIONS

#### A.   Plaintiff's Attempt to Enforce the FDCA Is Preempted

Plaintiff's Complaint is largely an epistle on Food and Drug Administration regulations. It contains no less than 27 citations to chapter 21 of the Code of Federal Regulations implementing the FDCA, and five of its seven exhibits are outdated FDA correspondence with unrelated parties. Much of the Complaint is spent arguing the intricacies of FDA regulations as they apply to various categories of ice cream and related products. The only factual bases for Plaintiff's allegations that Unilever's Breyers ice cream labels deceive consumers are conclusory allegations that any Products not conforming to FDA regulations, as interpreted by Plaintiff, are deceptive. FAC ¶ 66. Plaintiff's most relied-on source for how consumers allegedly interpret "vanilla ice cream" is a 1979 letter from an FDA official to an ice cream company interpreting FDA regulations at 21 C.F.R. 135.110 and 101.22. FAC Ex. A. That letter says nothing about how consumers, even in 1979, interpreted or perceived ice cream labels. It is an advisory

5

interpretation of the FDA's enforcement position at the time, in a very different era of food regulation, like the rest of Plaintiff's Exhibits A-E.

This focus on food and drug regulations as the sole basis for Plaintiff's allegations of consumer deception reveals the Complaint as Plaintiff's attempt to privately enforce the FDCA, filed because Plaintiff's counsel believes it has spotted a technical violation of FDA regulations. But Plaintiff is not the FDA, and is neither competent to interpret FDA regulations nor empowered to enforce them.  The right to enforce the FDCA rests exclusively with the FDA. *See* 21 U.S.C. § 337(a); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997) (there can be no private cause of action if a plaintiff's "true goal is to privately enforce alleged violations of the FDCA"); *Verzani v. Costco Wholesale Corp.*, No. 09-cv-2117, 2010 U.S. Dist. LEXIS 107699, at *8 (S.D.N.Y. Sept. 28, 2010) ("The FDCA lacks a private right of action and therefore [a plaintiff] cannot rely on it for purposes of asserting a state-law consumer claim under G.B.L. § 349"), *aff'd*, 432 Fed. Appx. 29 (2d Cir. 2011).

Not only can Plaintiff not explicitly seek to enforce the FDCA directly, he also cannot do so under New York law, under the guise of a state-law cause of action.  Such claims are impliedly preempted by the federal statute.  "Where a state law claim would not exist but for a FDCA regulation, [21 U.S.C.] § 337(a) impliedly preempts the claim."  *Patane v. Nestle Waters North America, Inc.*, 314 F. Supp. 3d 375, 387 (D. Conn. 2018) (dismissing state-law deceptive practices claims where "[e]ach and every one of plaintiffs' claims are wholly FDCA-dependent").  There could be no clearer example of a lawsuit that seeks to enforce the Food, Drug & Cosmetic Act, thinly veiled as a state consumer protection law claim, than this case. Every aspect of Plaintiff's claims centers on one of the many FDA regulations cited throughout the Complaint, with no allegations of any independent state-law duty and no independent

supporting factual contentions.  This is truly a case that "would not exist but for a FDCA regulation."  *Id.*

### B.      No New York Food Law Covers the Subject Matter of this Lawsuit

An exception to FDCA preemption exists if a state has enacted food regulations that impose identical standards as to those of the FDCA.  In addition to imposing these standards, the state must also provide a private right of action to enforce the state food regulations.  Some states, such as California, have enacted broad mini-FDCAs (the Sherman Food, Drug, and Cosmetic Law, H.S.C. §§ 109875 et seq.), which may enable plaintiffs to, in effect, enforce the FDCA, if they are careful to plead violations of the Sherman Law instead of the federal statute.

New York, unlike these states, has not enacted a comprehensive food law.  New York has enacted only limited laws regulating foods of special interest to this jurisdiction.  Most of those provisions are found in the Agriculture & Markets Law, which, as its title suggests, focuses more narrowly on promulgating standards for specific foods and food-related practices.  Courts have examined the scope of New York's food law and regulation in cases like this one, where plaintiffs attempted to circumvent FDCA preemption by asserting state law causes of action supposedly in parallel with the FDCA.  The courts that have given serious consideration to the matter, often adjudicating multi-state purported class actions, have concluded that New York does not have a comprehensive food regulatory scheme that would permit actions such as this one.

"[I]n New York and many other states, courts have concluded that where a state has not adopted statutes that expressly mirror the FDCA, like California's Sherman Law, a plaintiff's claim that relies on the defendant's failure to comply with federal regulations is impliedly preempted," held the court in *In re Trader Joe's Tuna Litig.*, 289 F. Supp. 3d 1074, 1086 (S.D.

7

Cal. 2017), dismissing with prejudice a plaintiff's New York G.B.L. §§ 349-350 claims that relied on the FDA regulatory standard for declaring the weight of cans of tuna. "Where, like here, a plaintiff's true purpose is to enforce federal regulations, masquerading as a state-law claim where the state has not adopted a parallel statutory scheme is not sufficient to escape preemption." *Id.*, *citing Verzani*, 2010 U.S. Dist. LEXIS, at *3 ("[Plaintiff's] persistent allegations that Costco's labeling of the Shrimp Tray violates the FDCA['s] ... regulations on the labeling of 'shrimp cocktails' indicates that his true purpose is to privately enforce alleged violations of the FDCA, rather than to bring a [state-law] claim for unfair and deceptive business practices.").

In *Patane v. Nestle Waters North America, Inc.*, 314 F. Supp. 3d 375 (D. Conn. 2018) ("*Patane I*"), as here, Plaintiff challenged a food's statement of identity – "spring water" in that case – and contended that it was deceptive because, allegedly, it did not conform to the FDCA's requirements, lodging its claims under the laws of several states, including New York. *Id.* at 378. The court initially dismissed the case as to all states, noting that one preemption provision in the FDCA prevents anyone except the U.S. government from enforcing its provisions (*id.* at 385, citing 21 U.S.C. § 337(a)), while another preempts any state from imposing standards of identity that are "not identical" to those of the FDCA (*id.* at 384-85, citing 21 U.S.C. § 343-1(a)(1)). The plaintiffs in *Patane I* amended their complaint, and ultimately were allowed to proceed in New York, among other states, because New York has a limited law defining "spring water" as part of its Sanitary Code, and does so consistently with the FDCA. *Patane v. Nestle Waters of North America, Inc.*, 369 F. Supp. 3d 382, 392-93 (D. Conn. 2019) ("*Patane II*"), citing 10 N.Y.C.R.R. § 5-6.3. As to that product, plaintiff's amendments met the requirement of

pleading an independent state-law duty that could serve as the basis for their claims.  *Patane II*, 369 F. Supp. 3d at 388.

Here, on the other hand, Plaintiff has not pled any New York specific regulations in its Complaint or First Amended Complaint.  Rather, as stated above, Plaintiff's Complaint is riddled with citations to the FDCA.  This is because New York has no comprehensive state food regulatory law like California's Sherman Law, and it has no special regulation of vanilla flavoring in ice cream like its regulation of spring water.  Therefore, under the analysis of *Patane I* and *Patane II*, Plaintiff's attempts to enforce the FDCA are preempted and should be dismissed.  Further, because there exists no independent state law duty that Plaintiff could allege, amendment of the Complaint would be futile and should not be allowed.

### C.    Even if a New York Food Law Covered this Lawsuit, Plaintiff Lacks Standing to Enforce It

Even if some New York law were read expansively to cover Plaintiff's claims here, Plaintiff would still have to allege the existence of a private right of action that gives Plaintiff standing to enforce that law.  With respect to the Agriculture & Markets Law, for example, such a right does *not* exist; Section 32 of that law makes clear that the Commissioner of Agriculture and Markets, not individual plaintiffs, has the right to investigate and bring actions under the New York Agriculture and Markets Law. 1 N.Y.C.R.R. § 32.1 ("The commissioner [of Agriculture and Markets], or any officer of the [state] department [of Agriculture and Markets] when authorized by the commissioner, may investigate and report as to all matters within or pertaining to the powers and jurisdiction of the department, and for the purposes of carrying into effect the provisions of this chapter or of any other law relative to matters within its jurisdiction and the rules of the department.").

New York has no counterpart to California's "unlawful prong" of its Unfair Competition Law, which provides a private right of action for an alleged violation of any of several consumer-focused statutes.  Cal. Bus. & Prof. Code § 17200 (providing that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act" in addition to untrue or misleading advertising).  This is what has enabled California plaintiffs to assert private rights of action for violations of California's Sherman Law.  Without such a device, New York's food regulations, whatever their scope, are merely another system of regulation, just like federal food regulations, that private plaintiffs have no standing to enforce.

D.     **The Product Complies with All Regulations, and Plaintiff's Attempt to Impose Additional Requirements Is Preempted**

Although litigating Plaintiff's theory of FDA regulations in cases like this is exactly what the FDCA's preemption provisions are intended to prevent, an analysis of Plaintiff's theory shows why it is good policy that such plaintiffs are not permitted to enforce food regulations. Plaintiff has built a theory of FDCA violation by plucking provisions and regulations from different parts of the Act, while ignoring other provisions that inconveniently invalidate his claims.  The result is that almost everything Plaintiff alleges about food regulations is legally incorrect, and the Product complies fully with those regulations even if what Plaintiff guesses about its actual contents were true (which, as discussed below, it is not).

Plaintiff attacks two areas of the Product's packaging, both closely governed by extensive federal regulations.  The first and main attack is against the official product name, "Natural Vanilla Ice Cream," as shown on the primary display panel (PDP).  Plaintiff contends that "Vanilla" in the Product name must be the common name of the ingredient(s) that provide the vanilla flavor in the ice cream, as provided in the Act's specific vanilla flavoring regulations, as

if the ice cream were being marketed as a vanilla extract.  Therefore, Plaintiff asserts, if the ingredient(s) providing the vanilla flavor is anything other than vanilla extract, this word may not be merely "Vanilla," or else the product is misbranded under 21 U.S.C. § 343(g).  This is wrong.

In the Product's name, under the regulations, the portion of the name subject to an FDA standard of identity is "Ice Cream," whose accuracy is undisputed.  "Vanilla," a flavoring, is an optional word in the Product name.  Under 21 U.S.C. § 343(g), a food for which there is a standard of identity must bear on its label "the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (*other than spices, flavoring, and coloring*) present in such food" (emphasis added).  The FDCA thus specifically exempts the name of a flavoring, when included in the name of a food, from having to comply with the standard of identity or common-name rules that would apply if it were an ordinary ingredient.  The vanilla standards of identity Plaintiff cites at 21 C.F.R. § 169.175(b)(1) and 169.177(b) (Dkt. 10 ¶ 78) are inapplicable to this Product.

The food regulations recognize what Plaintiff refuses to acknowledge:  flavor designators are not ingredient claims and are treated differently, because their purpose is to communicate what the product will taste like.  Under the regulations, the Product is properly labeled.

Plaintiff's second attack is on the Product's ingredient statement, where he alleges that "Because vanilla extract and vanilla flavoring are defined by standards of identity, they must be declared on the ingredient list with these names."  Dkt. 10 ¶ 76.  This, too, is wrong.  Under 21 C.F.R. § 101.22(h)(1), any "[s]pice, natural flavor, and artificial flavor may be declared as 'spice,' 'natural flavor,' or 'artificial flavor'" in the ingredient statement.  Vanilla extract is used in the Product as a flavor, and may be disclosed as "natural flavor" in the ingredient statement, whether it is used alone or combined with other natural flavors.  Again, the standards of identity

Plaintiff cites at 21 C.F.R. § 169.175(b)(1) and 169.177(b) (Dkt. 10 ¶ 78) are inapplicable.  They

may apply to a product such as the vanilla extract available on grocery store spice racks, but,

because of 21 C.F.R. § 101.22(h)(1), not to the listing of vanilla as a flavoring in another food,

such as ice cream.  This is confirmed by the standard of identity for ice cream, which provides

that "each of the ingredients used shall be declared on the label *as required by the applicable*

*sections of parts 101* and 130 of this chapter" explicitly adopting the exclusion in § 101.22(h)(1).

21 C.F.R. § 135.110 (emphasis added).  The Product's ingredient statement, which lists "natural

flavor" (Dkt. 10 ¶ 81), is fully compliant with regulations and is consistent with a product

flavored by vanilla extract alone or in combination with other natural flavors.

In sum, in products that employ vanilla as a flavor, the Food, Drug & Cosmetic Act does

not impose the requirements that Plaintiff alleges.  Plaintiff therefore is seeking to impose

additional requirements, beyond and inconsistent with regulatory provisions such as 21 C.F.R.

§ 101.22(h)(1), in the heavily regulated areas of the official front-panel product name and the

FDA-mandated ingredient statement.  Plaintiff's claims attempting to impose labeling

requirements not identical to those regulations are expressly preempted.  *Casey v. Odwalla, Inc.*,

338 F. Supp. 3d 284, 296 (S.D.N.Y. 2018) ("[I]f a product's packaging does not run afoul of

federal law governing food labeling, no state law claim for consumer deception will lie.").

## II.     PLAINTIFF DOES NOT PLAUSIBLY ALLEGE CONSUMER DECEPTION

### A.     Implausible False-Advertising Suits Are Dismissed as a Matter of Law

To prove conduct is materially misleading as required under New York General Business

Law §§ 349 and 350, a plaintiff must demonstrate that "a reasonable consumer acting reasonably

under the circumstances" would be misled.  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir.

2015).  A court may determine as a matter of law that an allegedly deceptive practice would not have misled a reasonable consumer.  *See Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013).

Although dismissal of false-advertising cases on this ground was once rare, a recent rash of meritless lawsuits has created a growing body of Rule 12 case law in this Circuit dismissing challenges to advertising claims because they would not deceive a reasonable consumer.  *See, e.g., Sarr v. BEF Foods*, No. 18-cv-6409-ARR, 2020 U.S. Dist. LEXIS 25594 (E.D.N.Y. Feb. 13, 2020) (dismissing case against a food label because it would not communicate a misleading message to a reasonable consumer); *Campbell-Clark v. Blue Diamond Growers*, No. 1:18-cv-5577-WFK (E.D.N.Y. Dec. 17, 2019) (dismissing allegations that packaging for "nut and rice" crackers implicitly overstated their nut content); *Reyes v. Crystal Farms Refrigerated Distrib. Co.*, No. 18-cv-2250, 2019 U.S. Dist. LEXIS 125971, at *8-16 (E.D.N.Y. July 26, 2019) (dismissing implausible allegations that "made with real butter" on mashed potato product implied absence of margarine); *Solak v. Hain Celestial Grp., Inc.*, No. 3:17-cv-0704-LEK-DEP, 2018 U.S. Dist. LEXIS 64270, at *8-36 (N.D.N.Y. April 17, 2018) (name of "veggie straws" snacks and images of vegetables are truthful in that they imply the snacks are made from vegetables, and do not reasonably imply that the snacks contain fresh, whole, ripe vegetables); *Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 341 (E.D.N.Y. 2018) (truthful claim that a juice is "cold-pressed" does not imply that it is only cold-pressed, and not also processed in any other way).

13

**B.      No Reasonable Consumer Believes that Identifying "Vanilla" as a
Flavor of Ice Cream Has Any of the Implications Alleged by Plaintiff**

The fundamental claim of the First Amended Complaint is that calling the Product

"natural vanilla ice cream" implies not just a flavor or taste claim, but an ingredient claim.

Plaintiff alleges that "vanilla ice cream" communicates not just any ingredient claim, such as that

the ice cream contains vanilla extract, nor even that it is predominantly flavored with vanilla

extract, but that it must be <u>exclusively</u> flavored with vanilla extract.

The plausibility of Plaintiff's key allegation must be considered in the context of what

Plaintiff contends is required to completely cure the deception – simply the insertion of the word

"flavored," so that the product would be called "natural vanilla flavored ice cream."  FAC ¶¶ 55,

63, 90.  By adding this one arguably redundant word, Plaintiff asserts, suddenly no reasonable

consumers would get the impression that vanilla extract is the exclusive flavoring, the exclusive

source of vanilla flavoring, or even necessarily present in sufficient quantity to lend a vanilla

character to the food.  This is implausible, but Plaintiff is forced to allege it, because his

Complaint is entirely inspired by a technical violation of FDA regulations, and he is hamstrung

by the implicit preemption doctrine from arguing for any greater remedy than would bring the

Products into technical compliance as he sees it.  This, however, is not how advertising law

really works.

Under the advertising laws, the alleged deceptiveness of the claim must stand on its own

merit, and non-compliance with FDA regulations is neither necessary nor sufficient to establish a

deceptive practice.  *Bush v. Mondelez Int'l*, No. 16-cv-02460-RS, 2016 U.S. Dist. LEXIS

174391, at *7-8 (N.D. Cal. Dec. 16, 2016) (noting that the Ninth Circuit applies the reasonable-

consumer test without being influenced by, or even considering, the existence of FDA

14

regulations).  Even if this suit were not preempted, Plaintiff must still plead plausibly that

"vanilla ice cream," no matter where, how, and in what context it is used, communicates that an

ice cream is flavored exclusively with vanilla extract.  Indeed, in states where (unlike New York)

this case would not be preempted, courts have held that a plaintiff must not only plead actual

deception, but specific reliance – not just reliance on the product being labeled lawfully, but

reliance on the actual misleading message allegedly communicated by the label.  *See Thomas v.*

*Costco Wholesale Corp.*, No. 5:12-CV-02908-EJD, slip op. at 12-13 (N.D. Cal. Mar. 31, 2014),

(rejecting a theory "not based on misrepresentation, [but] rather on the illegality of the products

themselves as their misbranding violates the Sherman Law, and therefore there is no need for

plaintiffs to prove reliance," and also rejecting the theory that the plaintiffs "relied on Defendant

not to sell them illegal products"; holding that instead, plaintiffs must plead and prove reliance

"on the representation").

There is no basis to allege that consumers receive any of Plaintiff's alleged ingredient

claims from the Product's packaging – especially compared with the cure that Plaintiff asserts

would make the label fully compliant and non-misleading.  The actual message communicated to

consumers by "natural vanilla" ice cream is that the carton they are holding contains ice cream

that tastes like vanilla, as opposed to chocolate, strawberry, or mango.

### C.      Plaintiff Has No Basis for His Assumptions about the Product's Ingredients

#### a.      Plaintiff's Assumptions Based on the Product Label Are Invalid

Plaintiff alleges that, far from being flavored entirely or predominantly with vanilla

extract, the Product contains only "de minimis" amounts of vanilla extract, inadequate to flavor

the ice cream on its own.  FAC ¶¶ 82-84.  These allegations are central to Plaintiff's contention

15

that consumers are deceived by the Product's packaging in any material way.  Plaintiff's first basis for alleging that the Product does not contain the represented type and amount of vanilla flavoring (i.e., vanilla bean extract in an amount sufficient to impart their vanilla flavor) is that the ingredient statement of the product includes the item "natural flavor" rather than "vanilla extract."  FAC ¶¶ 80, 82.

There are three errors with this assumption that are each individually fatal.  First, Plaintiff's claim is self-defeating because it admits that by listing "natural flavor" rather than "vanilla extract" in the ingredient statement, "it is clear that vanilla beans are not the exclusive source of the natural flavor."  FAC ¶ 82.  If true, this would mean that Unilever "clear[ly]" discloses this alleged information to consumers, and does not mislead them.  Second, however, this allegation is false; under a correct interpretation of FDA regulations, as explained above, listing "natural flavor" in the ingredient statement is consistent with a product flavored exclusively by vanilla bean extract.  21 U.S.C. § 343(i)(2) (spices, flavorings and colors may be designated in ingredient statements as spices, flavorings and colors, without naming each).

Third, Plaintiff fails to acknowledge that a product labeled "natural vanilla" ice cream may also contain secondary, non-vanilla flavor notes.  He alleges that an ice cream characterized as vanilla must contain only vanilla flavors, and nothing else.  FAC. ¶¶ 65, 66, 72.  This has no basis in law, regulation, modern food formulation techniques, or common sense.  It is as if Plaintiff alleged that an apple pie, which often contains additional flavors such as cinnamon and nutmeg to complement the main flavor of apple, is required to be labeled "apple and cinnamon and nutmeg pie" because every single flavor present must be disclosed.  A vanilla ice cream may include other, non-characterizing flavor notes such as creaminess, roundness, or sweetness (pure vanilla extract is quite bitter), provided by other natural flavors, to make up a complex flavor

16

profile.[3]  An ice cream manufacturer can either list vanilla extract and these other natural flavors

separately or combine them all as "natural flavor" or "natural flavors," at its option.

b.     Plaintiff's Chromatography Analysis Is Worthless

Plaintiff introduces a mass spectrometry analysis conducted by Dr. Thomas Hartmann as

a purported basis for alleging that there is de minimis vanilla extract and that the vanilla flavor in

the Product comes predominantly from non-vanilla extract vanillin.  Plaintiff alleges that besides

the vanillin chemical that primarily imparts vanilla flavor, three other marker compounds –

vanillic acid, p-hydroxybenzaldehyde, and p-hydroxybenzoic acid – should be present in vanilla

extract in very small concentrations, ranging from 0.2% to 6% of the amount of vanillin.

Plaintiff claims that because Dr. Hartmann's analysis did not detect any of these markers, he has

a plausible basis for his allegations with respect to the Product's flavoring.  FAC ¶¶ 92-116.

Significantly, the researcher who performed the mass spectrometry analysis does not

back up Plaintiff's claims.  In his report, Dr. Hartmann does not say that the chemical markers

vanillic acid, p-hydroxybenzaldehyde, and p-hydroxybenzoic acid were not detectable in the

sample, nor even that he looked for them.  Nor does he say that any chemicals not detected in the

sample necessarily are not present in it.  Such a statement would be irresponsible, because a

failure to detect any chemical in an analysis such as this could be the fault of the test itself,

especially where – as here – the chemicals are expected to be present in very small

concentrations.

---

[3] The FDA regulations, on which Plaintiff relies so heavily, contemplate that ice cream may
include added flavors not simulating the characterizing flavor(s).  As long as such flavorings are
not artificially derived, no disclosure of them is required.  21 C.F.R. § 135.110 (3)(i).

Without the need for an in-depth review of the mass spectrometry's methodology, Plaintiff's analysis suffers from one clear, fatal flaw that renders it worthless. The analysis has no "control" condition to show what the results would look like if the same method were applied to an ice cream that contains whatever Plaintiff would deem an adequate amount of vanilla extract. Without such a control condition, Plaintiff has no basis to allege that his test could have detected the tiny amounts of vanillic acid, p-hydroxybenzaldehyde, and p-hydroxybenzoic acid that he asserts should be there. Plaintiff's assertion that these markers are "not detectable by advanced scientific means" is empty rhetoric, supported by no reason to believe that his test is capable of detecting them. There is no basis to believe that Plaintiff's mass spectrometry analysis does not look exactly like the analysis of an ice cream whose vanilla flavor derives solely from vanilla extract. However, as explained below, in this case, we know that Plaintiff's analysis _does_ look exactly like one conducted on an ice cream whose vanilla flavor derives solely from vanilla extract in adequate amounts to flavor the product, because that is what this Product is.

The researchers who conducted Plaintiff's mass spectrometry analysis were given the wrong assignment. They were assigned to "extract and analyze the flavors from the vanilla ice cream" (Dkt. 10-1 at 1) – not to test specifically for the presence of the chemical markers of concern to Plaintiff, i.e., vanillic acid, p-hydroxybenzaldehyde, and p-hydroxybenzoic acid. A researcher tasked with determining whether those specific chemicals are present in the Product would take special steps to preserve those chemicals during the extraction and preparation process. The researchers retained by Plaintiff did not do this. As a result, the researchers' methodology was likely to have failed to preserve these chemicals. This could have been resolved by the simple procedure, standard in all fields of science, of having a control condition

18

to establish that the test can detect the chemicals if they are there in the expected amounts. Because this simple, obvious step was not taken, Plaintiff's mass spectrometry analysis tells nothing about the vanilla flavoring ingredients in Breyers Natural Vanilla Ice Cream, and should be disregarded.

D.    **Breyers Natural Vanilla Ice Cream Is Exactly What Plaintiff Claims It Is Represented as Being**

As the formulation documents attached to the accompanying Declaration of Adam Dalebroux show,[4] the flavoring component of Breyers Natural Vanilla Ice Cream is composed mostly of water and alcohol carriers, with vanilla bean extract making up almost all █████ █████ of the portion of the component that furnishes flavor. The component also contains a mixture of ██ additional natural flavorings present in very small quantities, including natural vanillin, designed to provide a more complex flavor profile than simple vanilla, by adding sweet, smoky, creamy and other notes. Neither the vanillin nor any of the other components of this mixture are present in sufficient quantity to characterize, reinforce, or extend the vanilla extract. As Unilever's flavor supplier confirms, that is neither their purpose nor their effect as used in this Product.

Each of the flavoring ingredients in Breyers Natural Vanilla Ice Cream other than vanilla extract is present in literally a trace amount, with a permitted range of between █████ and

---

[4] At the Pre-Motion Conference for this motion, the Court ordered discovery on the source of the vanilla flavor in the Product, to be completed prior to the filing of this motion. Unilever assumes that the Court expected to consider this information in the context of this motion, and intended, in effect, partially to treat the motion as one for summary judgment as it relates to the facts of the Product's vanilla flavoring. Accordingly, Unilever discusses this information in this part of the brief which, due to the information status as the proprietary trade secret of a flavor supplier not a party to this case, is being filed under seal.

████ of the flavoring ingredient.  This is between █████ and ██████ of the amount of vanilla extract in the Product.  Taking the median of the ranges both for vanilla extract and for each of these flavorings, as formulators generally aim for, there would be over ████ times as much vanilla extract as vanillin, or any of the other natural flavors, in the flavor package, and ████ times as much vanilla extract as all other flavors combined.  In the final ice cream product, that entire flavor package makes up ██████ of the ice cream, reducing the amount of each of the trace natural flavors to about █████████████████ of the final Product.  If we imagine a 5,000 gallon dairy tanker truck full of vanilla ice cream, there would be about ████████████ of vanillin in the entire truck, compared with about ███████ of vanilla extract.  That amount of vanilla extract is sufficient to characterize the taste of vanilla when diluted to that extent, but the contribution of vanillin or any of the other natural flavors, present in amounts █████ times less, make no contribution to the vanilla flavor.  Therefore, it is no exaggeration at all to say that the vanilla taste of Breyers Natural Vanilla Ice Cream is supplied entirely by vanilla extract.  And, because there is no allegation that that Product does not taste adequately of vanilla, this information establishes that there is sufficient vanilla extract in the Product to make the ice cream taste like vanilla.

This means that even if Plaintiff's suit is not preempted, even if his interpretation of FDA regulations is correct, and even if he has alleged plausibly that the Breyers package represents vanilla bean extract as the sole source of vanilla flavor, this case still fails.  Breyers Natural Vanilla Ice Cream comports with even the strictest interpretation of FDA regulations and with even the most extreme alleged vanilla message communicated by its packaging.  Plaintiff's allegations that the vanilla extract in the Product are "de minimis" and insufficient to flavor the product are not only baseless and irresponsible, but false.

20

### E.     Unilever's Actual Formulation Completely Invalidates Plaintiff's Spectroscopy Test

The formulation information produced by Unilever establishes that the vanillin in the product (i.e., the chemical present in both vanilla extract and natural vanillin that contributes much of the vanilla flavor) is entirely contributed by vanilla extract, not by added vanillin. Plaintiff's spectroscopy analysis was supposed to test this by detecting not only the chemical vanillin (which could come from either of these), but also three additional "marker compounds" that would allegedly be present only in vanilla extract.  As noted above, Plaintiff provided no evidence that his spectroscopy actually could detect those marker compounds, such as by providing an analysis of a control condition – an ice cream adequately flavored with vanilla extract – in which the test detected those compounds.  Plaintiff, however, by challenging the labeling of an ice cream that is exactly that, unwittingly arranged such a "control" condition in this case – and the spectroscopy analysis completely flunked the resulting validation test.  It proved incapable of detecting any of the supposed marker chemicals, in an ice cream flavored with vanilla extract in a concentration easily adequate to flavor it.  (The test also detected maltol, a false positive, as there is no maltol in the Product.)  This conclusively proves the spectroscopy test to be completely unreliable and useless in supporting Plaintiff's allegations.

### III.    PLAINTIFF'S ANCILLARY CAUSES OF ACTION ARE IMPROPERLY PLED AND/OR INAPPROPRIATE

Plaintiff alleges several common-law causes of action that piggyback on the facts of its main claim lodged under state consumer protection statutes.  These ancillary claims all fail because Plaintiff's core theory of deception fails.  Even if Plaintiff's deception theory held water, however, the ancillary claims would have to be dismissed because they are inadequately or improperly pled and/or simply inappropriate to the fact pattern Plaintiff alleges.

21

**Breach of Warranty**.  Plaintiff alleges that Unilever "warranted to Plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not." FAC ¶ 214.  These are allegedly implied, not express, representations.  Express warranty claims must be founded on express representations – that is, a literal affirmation of fact or promise about the specific thing Plaintiff alleges to be untrue.  *See In re Frito-Lay North America All Natural Litigation*, 12-MD-2413, 2013 U.S. Dist. LEXIS 123824, at *84-85 (E.D.N.Y. Aug. 29, 2013).

Plaintiff's claim for breach of implied warranty of merchantability must also be dismissed because Plaintiff did not allege that the Product is not of merchantable quality.  A breach of the implied warranty of merchantability occurs only when a product is "unfit for the ordinary purposes for which such goods are used" (U.C.C. § 2-314(c)) – in this case, unfit for human consumption.  Plaintiff did not and cannot plead this.  The only other plausible argument for a breach of implied warranty of merchantability is that the Product does not "conform to the promise or affirmations of fact made on the container or label" (U.C.C. § 2-314(f)), which is just a restatement of the definition of an express warranty, and requires a literal affirmation or promise.  These, again, were not pled; Plaintiff's case is based entirely on implied, not express, claims.

**Negligent Misrepresentation**.  Plaintiff's claim for negligent misrepresentation is inappropriate under these circumstances, in which Plaintiff alleges misstatements by an advertiser to a mass audience of consumers engaging in arm's-length transactions.  In New York, there must be a special relationship of confidence and trust to establish potential liability for negligent misrepresentation.  *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996) (requiring "special relationship" that places an exceptional duty of care on a speaker, such as where plaintiffs were

investors in a limited partnership and defendant was attorney and director of an affiliated company who personally solicited plaintiffs as investors). The duty to speak with care arises when "the relationship of the parties, arising out of a contract or otherwise, [is] such that in morals and good conscience the one has a right to rely upon the other for information." *Id.* at 263, quoting *International Prods. Co. v. Erie R. R. Co.*, 244 N.Y. 331, 338 (1927). To establish a claim for negligent representation the plaintiff must demonstrate "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011); *see also J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 115 A.D.3d 128, 141 (App. Div. 2014) (cause of action dismissed for complaint's lack of allegation of a relationship of trust and confidence between the parties). Negligent misrepresentation claims generally are lodged against individuals with a direct, one-on-one relationship with the plaintiff, especially professionals having special expertise, such as attorneys, accountants and consultants. *Kimmell*, 89 N.Y.2d at 263-64. Applying this theory where Plaintiff, and the putative class, is a member of a mass audience of consumers, with no direct relationship to Unilever, is improper, and the claim should be dismissed.

**Fraud**. Plaintiff's claim for fraudulent misrepresentation fails because he has not pled fraud with the required specificity. "To state a cause of action for fraudulent misrepresentation under New York law, a plaintiff must allege 'a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury.'" *McBeth v. Porges*, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 2016) quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir.

2006).   Claims of fraud "must be pled with particularity" beyond that of a normal claim.

*Schwartzco Enterprises LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014).

Further, under Fed. R. Civ. P. 9(b), Plaintiff must plead "details that 'give rise to a strong

inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless

disregard for the truth.'" *Id.*, quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir.

2013).

New York courts have held that in false-advertising cases involving mass-marketed

products, allegations that the defendant was commercially motivated to increase its market share,

to satisfy consumer desires and expectations, and to increase its sales and profits do not give rise

to the necessary strong inference that the defendant had an intent to defraud.  *See Sarr*, 2020 U.S.

Dist. LEXIS 25594 at 26-27, citing *In re Frito-Lay*, 2013 U.S. Dist. LEXIS 123824, at *25 and

*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  Plaintiff here does not even do this.

His only allegation of fraudulent intent just circularly reiterates his allegation of a false or

misleading statement:  "Defendant's fraudulent intent is evinced by its failure to accurately

identify the Products on the front label when they knew this was not true" [sic].  FAC ¶ 223.  No

basis for any finding of "strong inference of intent to defraud" is pled.

**Unjust Enrichment**.  Plaintiff's claim for unjust enrichment must fail because it is

duplicative of his fraud and false advertising claims. An unjust enrichment claim is not

available where it simply replicates another claim.  *See Weisblum v. Prophase Labs, Inc.*, 88 F.

Supp. 3d 283, 296-97 (S.D.N.Y. 2015) (dismissing unjust enrichment claim that was duplicative

of GBL claims); *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 392 (E.D.N.Y. 2017)

(same).  This rule has been repeatedly applied by New York's federal courts to dismiss add-on

unjust enrichment claims in cases similar to the current one.  *See, e.g.*, *Price v. L'Oreal USA,*

*Inc.*, No. 17-civ-0614, 2017 U.S. Dist. LEXIS 165931, at *13 (S.D.N.Y. Oct. 5, 2017) ("All of the claims in the Complaint are based on the same alleged misrepresentation by Defendants that the Products contain keratin.  Accordingly, Plaintiffs' New York unjust enrichment claim is dismissed as duplicative."); *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 568 (S.D.N.Y. 2016) (dismissing unjust enrichment claim on the grounds that it was duplicative).

## IV.    PLAINTIFF HAS NO STANDING TO SEEK INJUNCTIVE RELIEF

Plaintiff in this case has no standing to seek injunctive relief.  Numerous district courts in the Second Circuit have dismissed claims for injunctive relief in false advertising cases where, as here, the plaintiff is "now aware of the alleged misrepresentations that they challenge" and therefore "there is no danger that they will again be deceived by them."  *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 339 (E.D.N.Y. 2018) ("To the extent that plaintiff was deceived by defendants' products, he is now aware of the truth and will not be harmed again in the same way.  He therefore lacks standing to seek an injunction."); *Elkind v. Revlon Consumer Prods. Corp.*, No. 14-2484, 2015 U.S. Dist. LEXIS 63464, at *8 (E.D.N.Y. May 14, 2015); *Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 295-96 (S.D.N.Y. 2015) ("A plaintiff lacks standing to bring an action for injunctive relief when, as here, she does not allege that she will suffer any future injury as a result of defendant's continued conduct"); *Tomasino v. Estee Lauder Cos., Inc.*, 44 F. Supp. 3d 251, 256 (E.D.N.Y. 2014) (denying standing because plaintiff "has made clear that she does not believe the ANR products have the effects advertised by Estee Lauder").

## CONCLUSION

For the foregoing reasons, Unilever respectfully requests that this Court grant its motion to dismiss Plaintiff's First Amended Complaint.

Dated: May 22, 2020                         Respectfully submitted,

                                            */s/ August T. Horvath*
                                            August T. Horvath (AH 8776)
                                            *ahorvath@foleyhoag.com*
                                            FOLEY HOAG LLP
                                            1301 Sixth Avenue, 25th Floor
                                            New York, New York 10019
                                            Tel:  (646) 927-5500
                                            Fax (646) 927-5599

                                            *Attorneys for Defendant Unilever United*
                                            *States, Inc.*

26

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 22nd day of May 2020, a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service via electronic mail.


*/s/ August Horvath*
August T. Horvath